**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

RESORT TO FREEDOM, LLC,

Plaintiff, Civil Action No. 2:26-cv-05821-DCN

v.

RENT MY TIMESHARE CO.,
ROOTS AND ARROWS REAL
ESTATE INVESTMENTS LLC,
KIRSTIE DALTON, JONATHAN
BECKHAM, and DAVID BECKHAM,

Defendants.
_______________________________________/

**VERIFIED COMPLAINT AND JURY DEMAND**

Plaintiff Resort to Freedom, LLC ("Resort"), through counsel, states as follows for its Verified Complaint against Defendants Rent My Timeshare Co. ("RMT"), Roots and Arrows Real Estate Investments LLC ("Roots"), Kirstie Dalton ("Dalton"), Jonathan Beckham ("Jonathan Beckham"), and David Beckham ("Beckham") (collectively, RMT, Roots, Dalton, Jonathan Beckham, and Beckham shall be referred to as "Defendants").

**Parties, Jurisdiction, and Venue**

1. Resort is a Michigan limited liability company with its principal place of business located in Michigan. Resort does business as "LiveSuites."

2. RMT is a South Carolina corporation with its principal place of business located in South Carolina.

3. Roots is a South Carolina limited liability company with its principal place of business located in South Carolina.

4. Dalton is a South Carolina resident and, at all relevant times, has been the Vice President of RMT. Upon information and belief, Dalton also uses the name "Kirstie Beckham."

5. Jonathan Beckham is a South Carolina resident and, at all relevant times, has been an agent for RMT and/or Roots.

6. Beckham, who is also known as "Davie" Beckham, is a South Carolina resident and, at all relevant times, has been the President of RMT and the Managing Member of Roots.

7. This Court has subject-matter jurisdiction over this action pursuant to 18 U.S.C. § 1836(c) and 28 U.S.C. § 1331 because Count I arises under the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq., and has supplemental jurisdiction over Resort's state-law claims pursuant to 28 U.S.C. § 1367(a).

8. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties, and the amount in controversy is in excess of $75,000.

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2) because all Defendants reside in this District and a substantial part of the events or omissions giving rise to Resort's claims occurred in this District. The Definitive Agreement further provides that venue for any litigation arising from it lies in Georgetown County, South Carolina, which is within this District. (**Ex. C** at Art. 2, ¶ G.)

## <u>General Allegations</u>

10. Upon information and belief, Roots is owned by Dalton and Beckham, and Beckham is its Managing Member. (**Ex. C** at 5.)

11. RMT is a subsidiary of Roots. (**Ex. C** at 1.)

12. RMT and Roots contract with timeshare owners to utilize their transferable "points," which can be used to book timeshare properties that can, in turn, be rented by third party guests. RMT and/or Roots pay timeshare owners a set amount for their transferable points once a guest completes a stay made possible by the points.

13. In 2021, Resort developed proprietary software that allowed companies like RMT and Roots to effectively list and market the timeshare points across platforms such as Airbnb, VRBO, and booking.com. Resort's software allowed guests to experience seamless booking of properties in their preferred location, and ensured that if the guest completed their stay, RMT and Roots would receive the maximum value for the "points."

14. At the time Resort developed its proprietary software, numerous companies other than RMT and Roots were engaged in collecting points, but they lacked a system like Resort's software to maximize the potential value of the points.

15. Before Resort's software, companies such as RMT and Roots would use timeshare owners' points to book potentially attractive units at specific resorts for specific weeks, in hopes that they could, in turn, rent those units for the specific weeks for which they had been booked.

16. Resort's software allowed the points to be displayed for thousands of available timeshare locations and for as long as the points were valid, significantly reducing the risk to the points intermediary and maximizing the potential value of the points.

**Defendants Enter Non-Disclosure Agreements with Resort**

17. Resort spent hundreds of hours and tens of thousands of dollars to develop the first version of its proprietary software. Resort later invested approximately $250,000 more to build a second-generation version of the Software with an outside developer, and it has continued to develop automated booking and rebooking tools since then.

18. Once Resort completed version one of its software, Resort solicited numerous companies engaged in collecting points to market its software.

19. Defendants responded positively to Resort's solicitation.

20. In fact, Defendants indicated to Resort that they had an over-abundance of points without a sufficient mechanism to deploy them in the marketplace.

21. Upon information and belief, when Resort began discussions with Defendants, RMT and Roots' business was significantly lower than after Defendants began utilizing Resort's proprietary software.

22. Prior to revealing its proprietary and confidential trade secrets to RMT and Roots, Resort required RMT, acting through Beckham as its CEO and Dalton as its Vice President, to execute Non-Disclosure Agreements. (**Exs. A**, **B**.)

23. The Non-Disclosure Agreements were signed on September 19, 2022. (**Exs. A**, **B**.)

24. The Non-Disclosure Agreements defined Resort's Confidential Information as "any information or material which is proprietary to the Owner, whether or not owned or developed by the Owner, which is not generally known other than by the Owner, and which the Recipient may obtain through any direct or indirect contact with the Owner. Regardless of whether specifically identified as confidential or proprietary, Confidential Information shall include any information provided by the Owner concerning the business, technology and information of the Owner and any third party with which the Owner deals, including, without limitation, business records and plans, trade secrets, technical data, product ideas, contracts, financial information, pricing structure, discounts, computer programs and listings, source code and/or object code, copyrights and intellectual property, inventions, sales leads, strategic alliances, partners, and customer and client lists." (**Exs. A**, **B** at ¶ I.)

25. On behalf of RMT, Dalton and Beckham agreed that Resort's Confidential Information was "developed by… [Resort] by the investment of significant time, effort and expense, and that the Confidential Information is a valuable, special and unique asset of [Resort] which provides [Resort] with a significant competitive advantage, and needs to be protected from improper disclosure." (**Exs. A**, **B** at ¶ II.)

26. Resort's Confidential Information included (a) its calendar-scraping software and automated bots that synchronize resort availability into its property management system and listing channels; (b) its rate strategies, including approximately 400 rate plans, markups, owner-priority rules, minimum-stay rules, and yield-per-point pricing methods; (c) its owner lineup, master reservation sheets, and points data; (d) its rebooking bot and related logic; and (e) its non-public financial, revenue, staffing, and strategic information (collectively, the "Trade Secrets"). Resort's Confidential Information includes and consists of Resort's Trade Secrets.

27. RMT agreed that it would not disclose, copy, or modify Resort's Confidential Information without Resort's prior written consent, and that it would promptly advise Resort of any possible unauthorized disclosure or use of the Confidential Information. (**Exs. A**, **B** at ¶ II.A–C.)

28. Defendants agreed that their promises under the Non-Disclosure Agreement would continue until Resort sent them a "written notice releasing [them] from this Agreement." (**Exs. A**, **B** at ¶¶ IV, XI.)

29. In fact, Defendants agreed that they would not "attempt to do business with, or otherwise solicit any business contacts found or otherwise referred by [Resort] to [Defendants] for the purpose of circumventing, the result of which shall be to prevent the Owner from realizing or

recognizing a profit, fees, or otherwise, without specific written approval of [Resort].” (**Exs. A**, **B** at ¶ IV.)

30. Defendants’ agreement to keep confidential and not to circumvent Resort’s Trade Secrets was material to Resort to induce Resort to share its proprietary and confidential software with Defendants.

**RMT and Roots Engage Resort as Their Exclusive Software Solution**

31. Less than a month after executing the Non-Disclosure Agreements, on October 12, 2022, Resort, RMT, and Roots entered into a Definitive Agreement where Resort committed to provide RMT with “an exclusive software solution (hereinafter referred to as “Software”)” to “manage timeshare rentals.” (**Ex. C**, the “Definitive Agreement”)

32. As part of the Definitive Agreement, Resort agreed that the Software would be for the exclusive use of RMT and Resort and would not be marketed, sold, accessed by, or licensed to any other party. (**Ex. C** at Art. I, ¶ A.)

33. The Software constitutes Confidential Information under the Non-Disclosure Agreements and contains and utilizes Resort’s Trade Secrets.

34. Pursuant to the Definitive Agreement, RMT agreed that it would provide to Resort “timeshare interests of its clients to book reservations, booked by Resort with the assistance of the Software.” (**Ex. C** at Art. I, ¶ B.) RMT was responsible for handling “all client management, communications, and payouts.” (*Id.*)

35. The Definitive Agreement further obligated RMT to pay Resort a fee of 6% of the Gross Amount collected by RMT for rentals executed with the assistance of the Software, required Resort to acquire points exclusively from RMT, and barred Resort from contact with other buyers or licensees of the Software. (**Ex. C** at Art. I, ¶¶ E, G, H.)

36. The Definitive Agreement is governed by South Carolina law and entitles the prevailing party in any dispute to recover its reasonable attorneys' fees, expert fees, and litigation expenses. (**Ex. C** at Art. 2, ¶¶ F, L.)

37. On December 22, 2022, Resort, RMT, and Roots executed an amendment to the Definitive Agreement. (**Ex. D**, the "First Amendment".)

38. The First Amendment kept all of the Terms and Conditions of the original Definitive Agreement but amended the commissions paid to Resort to a monthly tiered structure of 10% for up to $75,000 per month, 15% for $75,000 to $100,000 per month, and 20% for more than $100,000 per month, and extended Resort's management to RMT's Airbnb and VRBO accounts at RMT's discretion. (**Ex. D** at Art. I, ¶¶ A–I, J.)

39. The First Amendment did not have a term.

40. From 2022 to 2025, Defendants were trained on, and given access to, every part of Resort's system.

41. For 2023 and 2024, Resort, RMT, and Roots worked collaboratively to book thousands of listings, monetizing tens of millions of RMT's timeshare points.

42. For each successful booking, Resort would receive, roughly, 20% of the gross proceeds of the booking, RMT and Roots would receive, roughly, 20% of the gross proceeds of the booking, and the timeshare owner would receive 60% of the gross proceeds of the booking.

43. Utilizing Resort's proprietary Software, Confidential Information, and Trade Secrets, the parties generated millions of dollars in proceeds for Defendants' clients.

44. From 2022 through present day, Resort continued to refine and perfect its Software, Trade Secrets, business practices, and efforts to monetize Defendants' points.

45. On March 14, 2025, Resort, RMT, and Roots executed a Second Amendment to the Definitive Agreement, extending the Definitive Agreement for an additional ten years so that it "shall be in effect until March 31, 2036." (**Ex. E**, the "Second Amendment," at ¶ 1.)

**Unknown to Resort, Defendants Misappropriated Resort's Trade Secrets and Confidential Information to Recreate the Software**

46. On October 17 and 18, 2026, Resort's General Manager, Jame Marcia Geñete, and two team members Michael Pepito and Adam Kirong, who together ran Resort's day-to-day operations remotely, gave notice of their resignations, stating that they had received a sudden offer to work directly for a client and had been asked to start the following Monday.

47. On Monday, October 19, 2026, Resort learned that Ms. Geñete, Mr. Pepito, and Mr. Kirong had begun working for RMT. Resort's Slack records show that by October 17, 2026, before any of them gave notice of their resignations to Resort, all three already held accounts in RMT's own Slack workspace ("Rentmytimeshareco") and were connected to Resort's Slack through those RMT accounts.

48. Shortly thereafter, Resort learned that, for more than a year, Defendants, acting through RMT's principals and agents, had engaged in a coordinated scheme to acquire Resort's Trade Secrets and Confidential Information, use them to replicate Resort's Software, cut Resort out of the Definitive Agreement, and take Resort's trained personnel, as set forth below.

49. Defendants had personal access to Resort's Trade Secrets and Confidential Information subject to the Non-Disclosure and Definitive Agreements and all amendments. For example, beginning in 2023, RMT's principals were trained on Resort's Software. In February 2023, Resort gave RMT principal Jonathan Beckham its user guides and a live walkthrough, and described to RMT how its calendar software operated, including its script and its automated bot running on a fixed schedule.

50. In July and August 2025, Jonathan Beckham obtained his own login to Resort's second-generation calendar-scraping software, video instructions on how it works, and a mapping file that identified Resort's own listings, and by mid-August 2025 he was running Resort's software himself.

51. As early as 2025, RMT was attempting to use that information to copy Resort's system. Jonathan Beckham wrote that he was "[t]rying to set the process up exactly as yall have it on the Livesuite side" and asked, "how do I mimic [the Livesuite] pricing model."

52. Beyond the information that Defendants received under the Non-Disclosure Agreements and Definitive Agreement, and outside of any work or communications authorized by Resort, RMT improperly obtained Resort's Trade Secrets, including its markup configuration, a pricing comparison sheet, Resort's price factors, and its owner's live yield and booking-decline practices through private messages with Ms. Geñete in September and December 2025. Jonathan Beckham then used the improperly obtained Trade Secrets to recreate the Software and cut Resort out entirely.

53. Jonathan Beckham told RMT's assistant to "just tell her to match the same he has."

54. In December 2025, Jonathan Beckham made a direct payment to the two Resort-placed virtual assistants assigned to RMT's account, Argen Kirong and Sarrah Sarmiento, outside the staffing agency through which Resort engaged them. Later, in August 2026, RMT began paying both assistants directly at well under half of the rate billed for them. Upon information and belief, these direct payments were made in exchange for Resort's Trade Secrets.

55. Shortly thereafter, RMT began executing its plan to cut out Resort. On March 2, 2026, after Resort's General Manager posted a list of owner accounts holding large point balances, Dalton directed RMT's staff: "Not one person on this list is being called until we figure out why

we're holding so many points up as an alternative booking option and booking so far out. … none are to be loaded either." Minutes later, Dalton announced minimum prices that Resort must charge ("we have stopped accepting reservations that aren't at least $18/per for Founders and up") and limits on how far ahead Resort could book ("not … further than 6 months").

56. The Definitive Agreement permits RMT to allocate points "based on supply and demand." (Ex. C at Art. I, ¶ G.) It does not give RMT any right to set Resort's rental prices, dictate how far in advance Resort may book, or condition the supply of points on Resort's compliance with RMT's pricing demands. Defendants nevertheless used points as leverage to control Resort's business. For example, on May 6, 2026, Beckham directed: "Due to current market demand and booking trends, all listings are required to increase nightly rates by 20%. This adjustment is mandatory for all properties. … If these changes are not made promptly, the points supply will significantly slow down." On June 23, 2026, Dalton directed RMT's staff to "hold all points," and on July 6, 2026, she told Resort that its team was "essentially on points probation."

57. That same day, Jonathan Beckham told RMT's assistant that he was planning what to do about Resort's calendar software because RMT was paying a lot for it.

58. The next day, Resort informed Dalton that RMT had no points left; Dalton replied, "Perfect," and RMT loaded only five new owner accounts over the following two weeks, compared with roughly twenty to forty per half-month in January and February. On March 10, 2026, Jonathan Beckham said the points and yield were "not worth it," again confirming Defendants' desire to cut Resort out.

59. On March 30, 2026, Beckham and Dalton sent Resort's owner a text message stating that RMT's "new platform" was ready.

60. Between June and July 2026, RMT caused Resort's personnel, on time paid for by Resort, to load hundreds of Resort-managed owners into RMT's own database at app.rentmytimeshares.com.

61. On July 7, 2026, Beckham announced that RMT would begin "working out of the RMT database," that he had "around 15m points to load," and that he needed "ALL reservations on Google Sheets to be 100% accurate, as we will have a hard cut off the night of the 20th to query that data." That same day, Jonathan Beckham asked RMT's assistant what Resort paid Ms. Geñete and said that he would hire her.

62. On June 15, 2026, RMT stopped using Resort's Software and thereafter limited the software fees owed to Resort for reservations confirmed on or before June 15, 2026. That same day, Jonathan Beckham directed the build-out of approximately 8,000 listings in RMT's own platform.

63. RMT used Resort's Trade Secrets and Confidential Information to set its own prices. In March 2026, Jonathan Beckham had RMT's assistant monitor Resort's rate and pricing structure, which were not available to the public and were only available by misuse of Resort's Trade Secrets and Confidential Information, and on June 17, 2026, two days after the shut-off, RMT's assistant reported that RMT had "put the prices back the same as [Livesuite]."

64. From June through September 2026, RMT cancelled approximately 43 reservations Resort had booked, restricted which owners Resort could book, withheld points, and ultimately demanded that Resort "immediately cease accepting new reservations."

65. After RMT was removed from Resort's Slack workspace on September 22, 2026, Dalton, using the account "Kirstie Beckham-RMT," invited Ms. Geñete into a Slack Connect channel hosted in RMT's workspace on September 30, 2026. Through that channel, between

October 3 and 11, 2026, Ms. Geñete sent RMT's personnel screenshots of Resort's Trade Secrets and Confidential Information, including Resort's proprietary rebooking bot, live owner points data and reservation codes, and Resort's internal payment communications. On or around October 5 2026, Ms. Geñete told RMT's assistant that she could add RMT personnel to Resort's two-factor authentication channel, and on October 7, 2026, Ms. Geñete confirmed to Resort that RMT had access to Resort's systems.

66. Even after Resort declined to join RMT's new platform, Defendants continued to seek Resort's confidential business data. For example, on October 7, 2026, Beckham asked for edit access to Resort's working records for brands outside the parties' arrangement.

67. Resort has been damaged by Defendants' actions.

68. Resort seeks judgment as set forth below.

**Count I – Violation of the Defend Trade Secrets Act**

69. Resort restates the foregoing allegations as though set forth here.

70. At all relevant times, Resort has been engaged in interstate commerce by providing an exclusive software solution to Defendants.

71. Resort's Trade Secrets include, without limitation: (a) its calendar-scraping software and automated bots that synchronize resort availability into its property management system and listing channels; (b) its rate strategies, including approximately 400 rate plans, markups, owner-priority rules, minimum-stay rules, and yield-per-point pricing methods; (c) its owner lineup, master reservation sheets, and points data; (d) its rebooking bot and related logic; and (e) its non-public financial, revenue, staffing, and strategic information. Defendants acquired the Trade Secrets under a duty of confidentiality and through improper means, including inducing

Resort's personnel to breach their duty to maintain secrecy, and used them to build and operate RMT's competing system.

72. Resort's information constitutes "trade secrets" within the meaning of 18 U.S.C. § 1839.

73. Since Defendants misappropriated Resort's Trade Secrets and other confidential and proprietary information, Defendants have been unlawfully using this information to circumvent their obligations to Resort and copy Resort's business model, giving rise to liability under 18 U.S.C. § 1836(b).

74. Resort's protected Trade Secrets and other Confidential Information have commercial value.

75. Resort's protected Trade Secrets and other Confidential Information have given Defendants an opportunity to obtain an unfair competitive advantage over Resort.

76. Resort has devoted substantial resources to the procurement and development of its protected Trade Secrets and other Confidential Information.

77. Defendants' conduct constitutes an actual and threatened unauthorized use and/or a disclosure of Resort's protected Trade Secrets and other Confidential Information belonging to Resort.

78. Defendants' conduct willfully and egregiously violated the Non-Disclosure Agreements executed on RMT's behalf by Beckham and Dalton, causing significant harm to Resort.

79. Resort took reasonable steps to preserve the secrecy of its protected Trade Secrets and other Confidential Information, including, among other things, requiring Defendants to

execute Non-Disclosure Agreements and using computer passwords to restrict access to its Trade Secrets and other Confidential Information contained on Resort's computers and internal servers.

80. Defendants have acquired Resort's protected Trade Secrets and other Confidential Information through improper means.

81. Defendants have wrongfully and improperly utilized Resort's protected Trade Secrets and other Confidential Information knowing that the protected Trade Secrets and other Confidential Information were the property of Resort and knowing that the use of the Trade Secrets and other Confidential Information was unauthorized.

82. Defendants knew that Resort derived economic value from its protected Trade Secrets and other Confidential Information and that Resort made reasonable efforts to maintain secrecy of its protected Trade Secrets and other Confidential Information.

83. Defendants continue to use Resort's protected Trade Secrets and other Confidential Information, which Defendants wrongfully and improperly acquired for their own gain.

84. Defendants' unauthorized use and possession of Resort's protected Trade Secrets and other Confidential Information constitutes misappropriation within the meaning of 18 U.S.C. § 1839.

85. As a direct and proximate result of Defendants' wrongful use of Resort's protected Trade Secrets and other Confidential Information, Resort has sustained and continues to sustain damages including, but not limited to, loss of profits, loss of customer relationships, and loss of goodwill, in excess of more than $1,000,000 per year.

86. Defendants' misappropriation of Resort's protected Trade Secrets and other Confidential Information has unjustly enriched Defendants because Defendants are using such information to advance their position in the industry without incurring the costs and efforts

associated with the creation of the same. Because Defendants' misappropriation was willful and malicious, Resort is entitled to exemplary damages of up to two times its damages and its reasonable attorney's fees. 18 U.S.C. § 1836(b)(3)(C)–(D).

87. Defendants are jointly and severally liable for the damages sustained by Resort.

88. Resort seeks judgment as set forth below.

**Count II – Violation of the South Carolina Trade Secrets Act**

89. Resort restates the foregoing allegations as though set forth here.

90. Resort's confidential and proprietary information constitutes trade secrets under the South Carolina Trade Secrets Act, S.C. Code Ann. § 39-8-10 et seq.

91. Resort's confidential and proprietary information constitutes trade secrets within the meaning of S.C. Code Ann. § 39-8-20(5) because the program, compilation, method, system, and process for exchanging timeshare owners' points into third-party bookings derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, the public or any other person who can obtain economic value from its disclosure or use, and is the subject of reasonable efforts to maintain its secrecy. Considered collectively, as the statute requires, these items make a substantial difference in the efficiency of Resort's process.

92. Resort took reasonable steps to preserve the secrecy of its protected Trade Secrets and other Confidential Information, including, among other things, requiring Defendants to execute Non-Disclosure Agreements and using computer passwords to restrict access to its Trade Secrets and other Confidential Information contained on Resort's computers and internal servers.

93. Resort's Trade Secrets and other Confidential Information are of great value to Resort because it invested a great deal of time and money into developing and maintaining its

Trade Secrets and other Confidential Information. Competitors, including Defendants, would find Resort's Trade Secrets and other Confidential Information valuable because they could avoid paying Defendants to manage the process within which Defendants' clients are able to monetize their timeshare points by allowing third-party bookings at timeshare resorts across the country.

94. Defendants misappropriated Resort's Trade Secrets and other Confidential Information within the meaning of S.C. Code Ann. § 39-8-20(2) by acquiring them through improper means, including bribery and inducement of breaches of the duty to maintain secrecy owed by Resort's personnel, and by disclosing and using them without consent when they knew or had reason to know that the Trade Secrets and other Confidential Information were acquired under circumstances giving rise to a duty to maintain their secrecy, including the Non-Disclosure Agreements.

95. Resort has been damaged as a result of Defendants' misappropriation of its Trade Secrets and other Confidential Information.

96. Defendants' misappropriation of Resort's Trade Secrets and other Confidential Information was willful, wanton, and in reckless disregard of Resort's rights.

97. In addition to its actual damages, including actual loss and unjust enrichment, Resort is entitled to injunctive relief under S.C. Code Ann. § 39-8-50, exemplary damages in an amount not exceeding twice its actual damages under S.C. Code Ann. § 39-8-40(C), and reasonable attorney's fees under S.C. Code Ann. § 39-8-80.

98. Defendants are jointly and severally liable for the damages sustained by Resort.

99. Resort seeks judgment as set forth below.

**Count III – Breach of Contract Against Roots and RMT**

100. Resort restates the foregoing allegations as though set forth here.

101. The Definitive Agreement is an enforceable agreement between Roots, RMT, and Resort.

102. Roots, RMT, and Resort agreed that the Definitive Agreement should be in effect until March 31, 2036.

103. Roots and RMT breached the Definitive Agreement, including the covenant of good faith and fair dealing implied in it, by (a) ceasing to use Resort's Software on June 15, 2026, during the term, and replacing it with a platform built from Resort's Trade Secrets and Confidential Information; (b) avoiding the fees and commissions owed to Resort; and (c) arbitrarily cancelling Resort's reservations, restricting owners, and withholding points to frustrate Resort's performance while Resort remained bound to acquire points exclusively from RMT.

104. Resort has been damaged by Roots' and RMT's breach of the Definitive Agreement.

105. RMT and Roots are jointly and severally liable for the damages sustained by Resort, and Resort is entitled to its reasonable attorneys' fees, expert fees, and litigation expenses under Article 2, ¶ L of the Definitive Agreement.

106. Resort seeks judgment as set forth below.

**Count IV – Breach of the Non-Disclosure Agreements Against RMT**

107. Resort restates the foregoing allegations as though set forth here.

108. The Non-Disclosure Agreements are valid and enforceable contracts between Resort and RMT, governed by Michigan law, whose obligations survive indefinitely until Resort provides a written release, which Resort has never done. (**Exs. A**, **B** at ¶¶ XI, XII.)

109. RMT breached the Non-Disclosure Agreements by copying, modifying, using, and disclosing Resort's Confidential Information without Resort's written consent, by failing to advise Resort of the unauthorized disclosures it was receiving, and by attempting to do business with and

soliciting business contacts referred by Resort—including Resort's personnel and owners—to prevent Resort from realizing its profits and fees. (**Exs. A**, **B** at ¶¶ II, IV.)

110. Resort has been damaged by RMT's breaches and is entitled to injunctive relief, any commissions due as a result of RMT's circumvention, and its reasonable attorney's fees and costs. (**Exs. A**, **B** at ¶¶ III, IV, X.)

111. Resort seeks judgment as set forth below.

**Count V – Unjust Enrichment (Pleaded in the Alternative)**

112. Resort restates the foregoing allegations as though set forth here.

113. In the alternative, and to the extent any of Resort's confidential and proprietary information is found not to constitute a trade secret, Defendants received a benefit from Resort by obtaining and using that information and by using the labor of Resort's personnel, on time paid for by Resort, to build RMT's owner database.

114. Defendants unjustly utilized Resort trade secrets and confidential and proprietary information in order to develop their own software for managing the exchange of timeshare points for money with third party guests.

115. Defendants have not paid Resort for the use of its trade secrets and confidential and proprietary information.

116. Defendants' receipt and retention of the benefit from Resort without payment constitutes unjust enrichment.

117. Resort has been damaged as a result of Defendants' unjust enrichment.

118. Defendants are jointly and severally liable for the damages sustained by Resort.

119. Resort seeks judgment as set forth below.

**Count VI - Conversion (Pleaded in the Alternative)**

120. Resort restates the foregoing allegations as though set forth here.

121. The tort of conversion is any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein.

122. In the alternative, and to the extent not displaced by S.C. Code Ann. § 39-8-110, Resort owns certain confidential business property, including its reservation sheets, owner lineup, user guides, and software files, which Defendants have taken and retained.

123. Defendants always knew that Resort's protected Trade Secrets and other Confidential Information were the sole property of Resort.

124. Defendants' possession and use of Resort's protected Trade Secrets and other Confidential Information is without permission and without any lawful right to do so.

125. Defendants' continued possession and use of Resort's protected Trade Secrets and other Confidential Information items constitutes conversion.

126. Resort has been damaged as a result of Defendants' conversion.

127. Defendants are jointly and severally liable for the damages sustained by Resort.

128. Resort seeks judgment as set forth below.

## **Count VII – Civil Conspiracy**

129. Resort restates the foregoing allegations as though set forth here.

130. Defendants combined with each other, with Jonathan Beckham, and with Resort's former personnel for the purpose of injuring Resort by diverting its personnel and acquiring its Trade Secrets and Confidential Information, and committed overt acts in furtherance of that combination, including the direct payments, the September 30, 2026 Slack Connect channel, and the creation of RMT workspace accounts for Resort's personnel before they resigned.

131. As a result, Resort has suffered special damages distinct from those alleged in its other counts, including the cost of recruiting, training, and replacing its General Manager and team members and the Resort-paid hours its personnel spent performing unauthorized work for RMT.

132. Defendants are jointly and severally liable for the damages sustained by Resort. Resort seeks judgment as set forth below.

**Count VIII – Violation of the South Carolina Unfair Trade Practices Act**

133. Resort restates the foregoing allegations as though set forth here.

134. Defendants' conduct—inducing Resort's personnel to breach their duties, paying them covertly, and using the resulting information to cut Resort out of the timeshare-rental market—constitutes unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce under S.C. Code Ann. § 39-5-20(a). The conduct affects the public interest because it is capable of repetition against other businesses that serve RMT's owners and guests.

135. Resort has suffered an ascertainable loss of money or property as a result. Because Defendants' violations were willful or knowing, Resort is entitled to three times its actual damages, together with reasonable attorney's fees and costs. S.C. Code Ann. § 39-5-140(a).

136. Resort seeks judgment as set forth below.

**Relief Requested**

WHEREFORE, Plaintiff Resort to Freedom, LLC respectfully requests that this Court enter judgment in its favor and against Defendants, awarding the following relief:

A. Temporary, preliminary, and permanent injunctive relief preventing Defendants from using any trade secret information, confidential information, and proprietary information belonging to Resort and ordering Defendants to return it to Resort;

B. Temporary, preliminary, and permanent injunctive relief preventing Defendants from soliciting Resort's guests, personnel, and business contacts using Resort's Confidential Information;

C. An award of all damages against Defendants, including but not limited to actual damages, consequential damages, exemplary damages, punitive damages, and lost profits, in an amount to be determined at trial, arising from Defendants' use of Resort's trade secrets, confidential information, and/or proprietary information;

D. An award of exemplary damages under 18 U.S.C. § 1836(b)(3)(C) and S.C. Code Ann. § 39-8-40(C), and treble damages under S.C. Code Ann. § 39-5-140(a);

E. An award of reasonable attorneys' fees, costs, and interest under 18 U.S.C. § 1836(b)(3)(D), S.C. Code Ann. §§ 39-8-80 and 39-5-140(a), Article 2, ¶ L of the Definitive Agreement, and ¶ X of the Non-Disclosure Agreements;

F. All such other relief as this Court may deem just, equitable, or appropriate under the circumstances.

**Jury Demand**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff Resort To Freedom, LLC hereby demands a jury for all matters so triable.

Respectfully submitted,

**BOSTIC LAW, LLC**
/s/ Christopher M. Ramsey
Christopher M. Ramsey
Fed Bar No. 10147
2236 Ashley Crossing Drive
Charleston, SC 29414
(843) 571-2525
Fax: (843) 571-7050

cramsey@bosticlaw.com

and

WINTHROP & WEINSTINE, P.A.
H. William Burdett, Jr. *pro hac vice forthcoming*
Taeler K. Power *pro hac vice forthcoming*
225 South Sixth Street, Suite 3500
Minneapolis, Minnesota 55402
(612) 604-6400
bburdett@winthrop.com
tpower@winthrop.com

Dated: November 10, 2026

*Attorneys for Resort To Freedom, LLC*